FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2019 JAN 14 AM 11: 25

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| HYUN JUNG HONG, | ) | No. 77164-7-I |
| | ) | |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| CHRIS YOO and JIEUN YOO, | ) | UNPUBLISHED OPINION |
| husband and wife; SUMMIT ASSET | ) | |
| STRATEGIES GROUP, LLC, a | ) | FILED: January 14, 2019 |
| Washington limited liability company; | ) | |
| SUMMIT ASSET STRATEGIES | ) | |
| INVESTMENT MANAGEMENT, LLC, | ) | |
| a Washington limited liability company; | ) | |
| SUMMIT ASSET STRATEGIES | ) | |
| WEALTH MANAGEMENT, LLC, | ) | |
| a Washington limited liability company; | ) | |
| ESTATE OF MICHAEL GREINER | ) | |
| and JANE DOE GREINER, husband | ) | |
| and wife; WOO J. CHANG and JANE | ) | |
| DOE CHANG, husband and wife; | ) | |
| SONNY KO and JANE DOE KO, | ) | |
| husband and wife; ANDREW HONG | ) | |
| and JANE DOE HONG, husband and | ) | |
| wife, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

MANN, A.C.J. — Hyun Hong was one of many victims left in the wake of Chris

Yoo's ponzi scheme defrauding clients of their investment funds. Hong sued Yoo, and

three of Yoo's investment entities, alleging they were liable to Hong under the Securities Act of Washington, chapter 21.20 RCW (WSSA), for selling fraudulent securities. After Yoo declared bankruptcy, Hong filed an amended complaint naming Michael and Denise Greiner as defendants alleging that Greiner was secondarily liable as an officer or director of one of Yoo's investment entities.[1]

Hong appeals the trial court's decision granting summary judgment and dismissing her claims against Greiner. We affirm.

I.

Yoo founded several different investment companies. Three are relevant to this appeal. First, Summit Asset Strategies Group, LLC (SASG), also known as Summit Asset Strategies, LLC, was a holding company owned by Yoo. Yoo owned 100 percent of SASG. Second, Summit Asset Strategies Investment Management, LLC (SASIM) was a wholly-owned subsidiary of SASG and referred to interchangeably as Summit Asset Strategies Investment Management and Banking, LLC (SAS-IMB). SASIM was an investment advisor to several fixed-income investment funds, which it owned and managed. And finally, Summit Asset Strategies Wealth Management, LLC (SASWM) was a retail wealth advisory firm founded by Yoo, originally created as a wholly-owned subsidiary of SASG. SASWM advised its clients on financial planning and traditional investments such as stocks, mutual funds, and exchange traded funds.

Greiner was hired in July 2007 as director of SASWM's Wealth Management Department. In July 2009, Yoo promoted Greiner to Chief Executive Officer (CEO) of

---

[1] Michael Greiner passed away in November 2017 and the Estate of Michael Greiner was substituted pursuant to RAP 3.2. We refer to Denise and Michael Greiner and the Estate of Michael Greiner as Greiner.

2

SASWM. At the same time, Yoo offered Greiner a one-eighth minority ownership in SASWM. Greiner paid $5,000 for his share. Greiner left SASWM on September 30, 2014, after he learned that the SEC was investigating securities fraud by Yoo.

Hong first learned of Yoo and his investment entities in 2007 after reading about them in a local Korean newspaper and hearing about him from members of her church. Hong is a retired nurse who had recently inherited money from her husband and decided to invest it. Hong had little experience investing and never had a financial advisor before Yoo.

Hong met with Yoo in 2007 and told him that her primary concerns were safety and liquidity as she was close to retiring. Based on Yoo's recommendation, on November 7, 2007, Hong made two $100,000 investments in a fund named Summit Strategic Opportunities Fund I, LLC (SSOP I), a fixed-income fund through SASIM. Hong wrote two $100,000 checks to Summit Asset Strategies. Yoo did not provide an offering document regarding the investment, nor ask Hong to sign a subscription agreement or account agreement. The two accounts were merged in 2009. This investment is not at issue in this appeal because Hong closed that account and withdrew her funds with interest in July 2011.

In March 2008, Hong told Yoo that she was pleased with her first investment. Yoo recommended that Hong refinance her home and secure a line of credit to invest in Summit Strategic Opportunities Fund III, LLC (SSOP III). Yoo told Hong that SSOP III was a fixed-income fund similar to SSOP I. Yoo promised an annual return of 7.5 percent. Yoo facilitated refinancing Hong's home by introducing her to a Bank of America loan officer. Hong invested the amount of her home equity loan, $255,650.69,

on March 27, 2008, in SSOP III. Hong made an additional $25,000 investment in SSOP III on November 20, 2009. On February 17, 2012, Hong invested $210,000 in SSOP I. A letter from SAS-IMB showed that a new SSOP I account was opened for Hong in the amount of $210,000.[2]

Hong wrote checks to "Summit Asset Strategies" for both the November 2009 $25,000 investment in SSOP III and the February 2012 $210,000 investment in SSOP I. Hong did not produce a check for the SSOP III $255,650.69 investment. The record includes an investment agreement, dated January 31, 2009, with a blank signature line for "Summit Asset Strategies, LLC," dated January 31, 2009. The Investment Agreement indicated that SASG was the investment advisor. None of Hong's investments are identified in the Investment Agreement.

Hong received monthly statements on SASWM letterhead for her investments in SSOP III and SSOP I. However, the confidential disclosure footer on each monthly statement stated the investment holdings were held by "Summit Asset Strategies, LLC." On May 29, 2014, Hong received a letter from SASG, signed by Chris Yoo, explaining that Hong would begin receiving account statements on a quarterly, instead of monthly basis. This letter was printed on SASIM letterhead.

The governing documents for SSOP I showed that the fund was owned, operated, and managed by SASG and SASIM, not SASWM. The initial governing documents for SSOP I, dated September 15, 2008, indicated that "[t]he Initial Manager shall be Summit Asset Strategies, LLC" and that the manager had "exclusive control" of the fund, including the power "to carry out and implement directly or through such

_____

[2] In June 2015, Hong made an additional investment of almost $55,000 in a fund named RYDEX. The RYDEX investment is not an issue in this appeal as it was made after Greiner left SASWM.

agents as the Manager may appoint, including itself, any and all of the objectives, purposes and powers of the Company." The "Current Manager" was identified as "Summit Asset Strategies, LLC."

By 2009, SASIM became the manager of SSOP I. The fund's financial statements indicated: "Summit Asset Strategies Investment Management (SASIM), a Washington State registered investment adviser, actively manages the Fund I and owns 100% of its outstanding member units. The manager of SASIM is Mr. Sung Ko, and the individual principally responsible to manage Fund I." The SEC Form D for SSOP I, dated September 1, 2010, indicated that Yoo was the fund manager, and the fund was incorporated in 2008. The Form also indicated that the date of first sale was September 1, 2010.

SSOP III was never registered as a security with the SEC or Washington Secretary of State. Neither Greiner, nor Thomas Keeney, another investment advisor at SASWM, were ever aware of SSOP III funds. Keeney also indicated while he was employed at SASWM from 2011 until 2014 that Hong was not a customer of SASWM.

Greiner testified that some of his clients were invested in SSOP I and that SSOP I was managed and operated solely by employees of SASIM. Ten to twelve of Greiner's clients at SASWM also invested in SSOP I through SASIM, but Greiner did not have general access to the names of SSOP I investors, unless they were also investors with SASWM. Hong was not one of those investors. Greiner did not recall meeting Hong, however, Hong recalls shaking Greiner's hand once, after Yoo introduced her to Greiner.

Hong filed her original complaint in this matter in January 2016 against Yoo, SASG, SASIM, and SASWM, claiming damages for securities fraud under the WSSA, breach of fiduciary duties, and violation of the Washington Consumer Protection Act (CPA), chapter 19.86 RCW. Yoo filed a bankruptcy petition in the Western District of Washington that same month. On March 22, 2016, Hong filed an amended complaint to include Greiner, Woo Chang, Sonny Ko, and Andrew Hong. Hong's amended complaint alleged that Greiner was liable under RCW 21.20.430 for his role as a control person and later CEO of SASWM.

On May 27, 2016, Greiner filed a motion to dismiss. The trial court granted the motion in part and denied it in part, dismissing Hong's breach of fiduciary duty and CPA claims against Greiner. Within the same action, but unrelated to this appeal, the trial court entered a default judgment against SASG, SASIM, and SASWM, Sonny Ko, and Yoo, which was later vacated for being in violation of the automatic stay in Yoo's bankruptcy.

On November 8, 2016, Greiner moved for summary judgment on Hong's WSSA claim. Greiner argued that he was not a control person, officer, or director of Yoo, SASG, or SASIM, and that SASWM, the entity that employed Greiner, was not the seller of Hong's securities. Greiner also raised as an affirmative defense that even if SASWM had been the seller of Hong's securities, Greiner could not be secondarily liable under the WSSA because he did not know of Yoo's fraud and could not have learned of it in the exercise of reasonable care due to the fact that Yoo deliberately hid the fraud.

Hong filed a cross-motion for summary judgment and argued that Yoo's sale of securities through SASWM was fraudulent under WSSA, and that Greiner was an

officer or control person at SASWM during the relevant period, and thus was secondarily liable for Yoo's fraud.

On December 19, 2016, the trial court granted Greiner's motion for summary judgment and denied Hong's cross-motion for summary judgment. The court held that Greiner was not a control person of Yoo, SASIM, or SASG. The court further found that SASWM was not the seller of Hong's securities, and that even if Greiner exercised reasonable care, Greiner would not have discovered Yoo's fraud. On June 22, 2016, the trial court denied Hong's motion for reconsideration.

Hong appeals.

## II.

Hong argues that the trial court erred in granting summary judgment because there was sufficient evidence to demonstrate that SASWM was the seller of her securities. We disagree.

An order granting or denying summary judgment is subject to de novo review. Ruvalcaba v. Kwang Ho Baek, 175 Wn.2d 1, 6, 282 P.3d 1083 (2012). "The moving party bears the initial burden of showing the absence of an issue of material fact." Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989); CR 56. When the moving party is the defendant and meets its initial burden, the burden shifts to the plaintiff to "make a showing sufficient to establish the existence of an essential element to that party's case." Young, 112 Wn.2d at 225. If the plaintiff fails to make that showing, the trial court should grant the defendant's motion for summary judgment. Young, 112 Wn.2d at 225.

A reviewing court views "the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party." Boyd v. Sunflower Prop. LLC, 197 Wn.

App. 137, 142, 389 P.3d 626 (2016). A trial court properly grants summary judgment when the party with the burden at trial fails to produce evidence on an essential element of the claim. Young, 112 Wn.2d at 225.

A.

The WSSA, which was modeled after section 410 of the Uniform Securities Act, was initially adopted in 1959. Haberman v Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 125, 744 P.2d 1032 (1987). The WSSA's "primary purpose is to protect investors from speculative or fraudulent schemes of promoters" of securities within the State of Washington. Helenius v. Chelius, 131 Wn. App. 421, 432, 120 P.3d 954 (2005). The WSSA makes it "unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." RCW 21.20.010. The WSSA creates two forms of civil liability for individuals and entities engaged in the offer or sale of securities: primary and secondary.

The WSSA imposes primary liability upon the "seller" of any security sold in violation of the WSSA. RCW 21.20.430(1). A seller is defined as any individual or entity whose "acts were a substantial contributive factor in the sales transaction." Haberman, 109 Wn.2d at 131. As the Haberman court explained:

> Considerations important in determining whether a defendant's conduct is a substantial contributing factor in the sales transaction include: (1) the number of other factors which contribute to the sale and the extent of the effect which they have in producing it; (2) whether the defendant's conduct has created a force or series of forces which are in continuous and active operation up to the time of the sale, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and (3) lapse of time.

Haberman, 109 Wn.2d at 131-32.

8

In addition to the primary liability of a seller, RCW 21.20.430(3) provides for secondary joint and several liability for partners, officers, directors, or any other person that "occupies a similar status or performs a similar function of" or "materially aids in the transaction" of a seller. RCW 21.20.430(3). Haberman, 109 Wn.2d at 132-33. In order to demonstrate that an individual had the requisite level of control for the imposition of secondary liability under the WSSA, a plaintiff must satisfy the two-part "Hines test" by showing: "first that the defendant actually participated in (i.e., exercised control over) the operations of the corporation in general; then he must prove that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated, but he need not prove that this later power was exercised." Garrison v. Sagepoint Fin., Inc., 185 Wn. App. 461, 502-03, 345 P.3d 792 (2015) (citing Hines v. Data Line Systems, 114 Wn.2d 127, 136, 787 P.2d 8 (1990)).

B.

As the plaintiff, Hong carried the burden of proof at trial. Young, 112 Wn.2d at 225. Hong did not allege, or offer evidence that Greiner sold securities to her such that he would be subject to primary liability. Thus, the question before us is whether Hong presented evidence that Greiner was subject to secondary liability. Hong did not meet her burden; she failed to demonstrate that SASWM was the seller of her investments, or that Greiner was subject to secondary liability.

First, there is no evidence that Greiner controlled SASG. Yoo was the sole owner of SASG. Greiner never worked for SASG and never served as an officer or director of the company.

Second, there is no evidence that Greiner controlled SASIM. SASIM was a wholly owned subsidiary of SASG, which was wholly owned by Yoo. Moreover, SASIM's offering and governing documents repeatedly discuss SASIM's key employees without mention of Greiner. For example, SASIM's Operating Agreement identified its managers as Yoo, Sonny Ko, and Woo Chang. Hong offered no evidence showing that Greiner acted as a control person, officer, or director of SASIM.

Third, while Greiner did serve as an officer and director of SASWM between July 2009 and September 2014, Hong failed to produce evidence that SASWM was the seller of the SOSP I and SOSP III investment funds that she invested in. To the contrary, Hong's checks were made out to SASG, not SASWM. Further, Hong received numerous documents indicating that her investments were issued by SASIM. For example, in February 2012, Hong received a letter from the Operations Team at SAS-IMB,[3] thanking her "for opening your new account with us." In May 2014, Hong received another letter from SASIM sent to her "because you are currently invested in Collateralized Fixed notes, structured investment Strategy or Summit Private Funds." And in August 2015, Hong received another letter from SASIM to its "Clients/Investors," informing them that SASIM was moving to a new location in Bellevue.

There was also no evidence that Hong was ever a customer of SASWM. Prior to the litigation, neither Greiner nor SASWM wealth management advisor Keeney had ever heard of Hong. Greiner testified that when customers of SASWM chose to invest in SASIM's fixed income funds, he required them to sign numerous forms governing those purchases, including copies of a subscription agreement, a private placement

---

[3] SAS-IMB is another name for SASIM.

memorandum, and a form acknowledging that the investor was an accredited investor. There was no evidence that Hong signed any of these forms.

On appeal, Hong relies on the monthly account statements she received with the SASWM letterhead. The monthly financial statements are insufficient as a matter of law to show that SASWM was the seller of Hong's securities for three reasons. First, the statements themselves are not evidence that SASWM sold Hong the securities, rather the statements are only evidence that SASWM may have held the securities at some point after the initial sale. A seller under the WSSA must have substantially contributed to the sale of the security. Haberman, 109 Wn.2d at 131. The monthly statements do not demonstrate that SASWM contributed to the sale because the statements were created after the sale occurred. Additionally, there is no evidence that SASWM's conduct "created a force or series of forces which were in continuous and active operation up to the time of the sale." Haberman, 109 Wn.2d at 131-32.

Second, the confidentiality statement in the footer of the monthly statements state: "[t]his confidential report is designed to reflect your investment holdings with Summit Asset Strategies, LLC . . . . All copies of statement is [sic] kept in a secure location within Summit Asset Strategies, LLC for future reference." The statements themselves indicate that the investment holdings were with SASG, not SASWM.

Finally, Greiner argued in his motion for summary judgment that the statements were fraudulent because they were not prepared in the manner SASWM prepared its monthly or quarterly statements, and through all the years Greiner worked at SASWM, he had never seen statements in that format. Greiner explained that he had never seen the monthly account statements on SASWM letterhead that Hong received. He

explained the procedure that SASWM used to send out monthly and quarterly statements. The custodian of the securities sent the monthly statements to clients— SASWM used TD Ameritrade Institutional (TD) and Schwab Institutional (Schwab). Greiner printed the quarterly statements off of SASWM's Morningstar platform. The quarterly statements had a cover page that said, "Summit Asset Strategies Wealth Management," but neither the SASWM logo, nor the SASWM letterhead appeared on the quarterly statements sent by SASWM.

When the burden shifted to Hong, she failed to respond to Greiner's argument that Yoo fraudulently created the statements and that was the only reasonable inference from the evidence. Young, 112 Wn.2d at 225. Instead, Hong offered only conclusory arguments that it was undisputed that SASWM was the seller, while failing to address the evidence presented by Greiner showing SASWM was not the seller, and that Hong was not a customer of SASWM. Hong continued to rely on the monthly statements, even though the statements failed to show that SASWM was the seller.[4]

Reviewing the evidence in the light most favorable to Hong, Hong failed to satisfy her burden of proving that SASWM was the seller of her securities. Hong also failed to demonstrate that SASWM was a substantive contributive factor in the sale of her securities. Because SASWM was not the seller of Hong's securities, Greiner was not secondarily liable as a control person, officer, or director of SASWM.

---

[4] In Hong's summary judgment reply brief, she also argued, that according to the Washington Secretary of State registration records, none of the other Summit entities were formed until 2009, demonstrating that the only Yoo entity formed when Hong invested in SSOP III in 2008 was SASWM. However, SSOP III was never registered with the SEC or Washington Secretary of State, and Hong offered no evidence of payment to SASWM for the 2008 SSOP III investment.

We affirm.

_____ Mann, A.C.J.

WE CONCUR:

_____

_____ Becker, J.